UNITED STATES BANKRUPTCY COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

In re:

Ulrich Felix Anton Engler and
Private Commercial Office, Inc.,

Debtors.
_________________________________/

Case No. 9:08-bk-04360-MGW
Case No. 9:08-bk-04365-MGW
Chapter 7

Substantively Consolidated

**MEMORANDUM OPINION ON PETITIONING CREDITORS' ADMINISTRATIVE EXPENSE APPLICATION**

Three creditors sued Ulrich Felix Anton Engler and Private Commercial Office—the Debtors in this case—in state court to recover money due under a promissory note. During their investigation in the state court case, the creditors discovered the Debtors were operating a Ponzi scheme. So the creditors filed this involuntary case to put an end to it. And they say the investigation they did before filing this case was instrumental in the Trustee successfully pursuing fraudulent transfer and other claims after this case was filed. The Court must now decide whether the creditors are entitled to an administrative expense claim for the pre-petition fees they incurred investigating the Debtors' Ponzi scheme, as well as the post-petition fees they say they incurred assisting the Trustee in his efforts to recover property for the benefit of the estate.

Under Bankruptcy Code § 503(b)(3)(A), a creditor is entitled to an administrative expense claim for fees and expenses directly related to preparing and filing an involuntary petition. The Court, however, concludes that work the creditors' counsel (Fowler White Burnette, P.A.) would have done had this case not been filed is not "directly related to" the involuntary petition. Since the creditors would have conducted their state court investigation had

this case not been filed, they are not entitled to an administrative expense claim for the fees related to that investigation. Nor are they entitled to an administrative expense claim under § 503(b)(3)(B) for the fees they say they incurred in assisting the Trustee to recover property for the benefit of the estate since the plain language of § 503(b)(3)(B) requires—but the creditors failed to obtain—court approval before for they took any action to recover property for the estate. Accordingly, the creditors' administrative expense claim is limited to the fees they incurred through the date the order for relief was entered for work they did solely because this case was filed.

**Background**

The Debtors in this case perpetrated a massive Ponzi scheme bilking investors out of hundreds of millions of dollars.[1] Engler apparently represented to potential investors that he had sophisticated, proprietary software enabling him to effectuate trades faster than other investors, yielding enormously large and sustainable profits. And he claimed he had a track record of success to prove it. In actuality, Engler had no such software—or track record of success. The only way for Engler to make good on the returns promised to investors was to acquire funds from new investors at an exponential rate. Those investors included Klaus Wolfschmidt, Reinhard Muller, and Anneliese Schmitt.

When Wolfschmidt, Muller, and Schmitt did not receive the promised returns, they retained Fowler White to pursue legal action against the Debtors. Immediately after it was retained in October 2007, Fowler White began investigating potential claims against the Debtors.[2] It appears from the time records filed with the Court that Fowler White filed a

[1] Doc. No. 916-1 at ¶¶ 7-8.

[2] *Id.* at ¶¶ 5-8.

complaint for damages and injunctive relief by mid-November 2007.[3] While that case was pending, Fowler White continued investigating the Debtor's assets.[4] Sometime during that investigation, Fowler White uncovered the widespread nature of the Debtors' fraud.[5] By late January 2008, Fowler White began considering a possible involuntary bankruptcy against the Debtors.[6]

Over the next three months, Fowler White conducted and analyzed various legal issues related to the potential involuntary case against the Debtors.[7] At the same time, it continued with its state court lawsuit against the Debtors.[8] Eventually, Fowler White determined an involuntary bankruptcy case was necessary to put an end to the Ponzi scheme and give creditors some hope of recovering on their "investments."[9] On March 31, 2008, Fowler White filed two involuntary bankruptcy cases—one against Engler and the other against Private Commercial Office—on behalf of their clients.[10]

Two weeks after this case was filed, Fowler White was approved as counsel for the petitioning creditors (their clients Wolfschmidt, Muller, and Schmitt). Neither Engler nor Private Commercial Office responded to the summons for the involuntary petition. So the petitioning

---

[3] Doc. No. 864-2.

[4] Doc. No. 864-2.

[5] Doc. No. 916-1 at ¶¶ 7-9.

[6] Doc. No. 864-2.

[7] *Id.*

[8] *Id.*

[9] *Id.*; Doc. No. 916 at ¶ 9.

[10] The involuntary case against Engler was styled: *In re Engler*, Case No. 9:08-bk-04360-MGW. The case against Private Commercial Office was styled: *In re Private Commercial Office, Inc.*, Case No. 9:08-bk-04365-MGW. The two cases were eventually consolidated. Doc. No. 51. All docket cites in this Memorandum Opinion are to the lead bankruptcy case: Case No. 9:08-bk-04360.

creditors moved for entry of an order of relief by default.[11] On April 29, 2008, the Court entered an order for relief;[12] Robert Tardif was appointed as the Chapter 7 Trustee the following day. Six months later, Fowler White was approved as special counsel.[13]

From the time this case was filed until Fowler White was retained as special counsel, the petitioning creditors say they: provided the Trustee with substantial information they obtained during their pre-petition investigation; assisted the Trustee in obtaining the information necessary to prepare the Debtors' schedules (such as the names and addresses of hundreds of victims of the Debtors' Ponzi scheme); prepared and filed an application to have these bankruptcy proceedings recognized in Germany; provided the Trustee with documents relating to the recovery of assets; provided the Trustee with information about the Debtors' associates, bank records, and assets; and assisted the Trustee by researching the Debtor's assets.[14] The petitioning creditors apparently incurred $156,944.42 in fees for work done by Fowler White from the time the firm was initially retained by the petitioning creditors in October 2007 until the time it was retained as special counsel by the Trustee in October 2008.

On October 15, 2012, the petitioning creditors filed their fee application.[15] In their fee application, the petitioning creditors only sought $102,569.53 in fees and expenses.[16] According to the petitioning creditors, they voluntarily reduced the fees and expenses they were seeking by

---

[11] Doc. No. 7.

[12] Doc. No. 9.

[13] Doc. No. 85.

[14] Doc. No. 916 at 10-11.

[15] Doc. No. 864 at ¶ 21.

[16] *Id.* The administrative expense application actually says it is seeking a total of $106,750.22. But when the Court adds up the categories of fees sought, the total only comes to $102,569.63. That amount ($102,569.63) is consistent with the amounts later specified in the petitioning creditors' motion for summary judgment. It appears the $106,750.22 was either a typographical or computational error. In either case, it has no impact on the Court's ruling.

$54,374.89.[17] The Trustee objected to the fees sought by the petitioning creditors.[18] So the Court scheduled a final evidentiary hearing on the petitioning creditors' administrative expense application.[19]

Before the final evidentiary hearing was held, the parties agreed to have the Court rule on the petitioning creditors' administrative expense claim on summary judgment. The petitioning creditors filed a motion for summary judgment seeking a total of $95,753.06 in fees and expenses.[20] According to the petitioning creditors, they are entitled to (i) $38,011.53 for fees and expenses incurred prepetition in connection with filing this case; and (ii) $55,916.53 for fees and expenses incurred after the case was filed (but before Fowler White was retained as special counsel) for work that resulted in the recovery of assets for the estate.[21] The Trustee objects to all but $6,138.25 of the pre-petition fees and expenses and all of the post-petition fees and expenses.[22] The Court must now decide the amount of pre-petition and post-petition fees and expenses, if any, the petitioning creditors are entitled to as a matter of law.

---

[17] *Id.*

[18] Doc. No. 889.

[19] Doc. No. 884.

[20] Doc. No. 916. There was a $6,816.47 difference between the petitioning creditors' initial administrative expense application and the amount sought in their motion for summary judgment. That difference is the fees incurred by the petitioning creditors' local counsel (Trenam, Kemker, et al.).

[21] *Id.* at ¶ 13. Although the petitioning creditors refer to the $38,011.53 as "prepetition fees," that amount actually includes work done after this case was filed through the date the order for relief was entered.

[22] Doc. Nos. 915 & 918.

**Conclusions of Law**[23]

Whether the petitioning creditors can recover the fees they incurred prepetition through the order for relief as an administrative expense is governed by § 503(b)(3).[24] Under § 503(b)(3)(A), a creditor may recover the actual and necessary expenses—other than attorney's fees and costs—incurred filing an involuntary petition.[25] Subsection (b)(4) then provides that reasonable attorney's fees are allowable as an administrative expense if a creditor is entitled to recover its expenses under subsection (b)(3).[26] The Trustee does not dispute that—when read together—subsections (b)(3) and (b)(4) provide a basis for the petitioning creditors to recover the attorney's fees and costs incurred filing this case.[27]

And the parties generally agree on the standard for determining which fees are allowable as an administrative expense under § 503(b)(3)(A). Previously, under the Bankruptcy Act of 1898, a petitioning creditor could only recover the time actually spent preparing and filing the involuntary petition.[28] That view has since been rejected.[29] It is now the prevailing the view—one shared by the parties in this case—that the petitioning creditors are not limited only to the

[23] The Court has jurisdiction over this case under section 28 U.S.C. § 1334(b). This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A) & (B).

[24] 11 U.S.C. § 503(b)(3)(A).

[25] *Id.*

[26] 11 U.S.C. § 503(b)(4).

[27] Doc. No. 915 at 4.

[28] *In re Hanson Indus., Inc.*, 90 B.R. 405, 410 (Bankr. D. Minn. 1988); *In re Baldwin-United Corp.*, 79 B.R. 321, 337 (Bankr. S.D. Ohio 1987).

[29] *Hanson Indus.*, 90 B.R. at 410; *Baldwin-United*, 79 B.R. at 337.

fees and costs spent on preparing and filing the petition.[30] In fact, both parties cite Judge Killian's decision in *In re Key Auto Liquidation Center*[31] for the proposition that a petitioning creditor is entitled to recover fees for time spent on matters "directly related" to preparing and filing the involuntary petition.

But the parties disagree on how that "directly related to" standard applies here. On the one hand, the petitioning creditors say work "directly related to" preparing and filing the petition necessarily includes contacting other creditors to join in the petition, legal and factual research regarding the grounds for filing the case, and litigating whether an order for relief should be entered. And according to the petitioning creditors, "legal and factual" research includes all of the work they did investigating the Debtor's Ponzi scheme. The Trustee, on the other hand, does not dispute that the petitioning creditors would be entitled to legal and factual research. He just believes the petitioning creditors are not entitled to recover any fees incurred before January 28, 2008—the first time the petitioning creditors considered an involuntary bankruptcy case. And he believes the petitioning creditors are only entitled to certain fees after that date. In all, the Trustee believes the petitioning creditors are only entitled to $6,138.25 in fees under § 503(b)(3)(A). Ultimately, the Court generally agrees with the Trustee.

Unfortunately, few cases address the specific issue before the Court—i.e., is legal or factual research done before a petitioning creditor has considered filing an involuntary case "directly related to" the involuntary petition. In *In re Baldwin-United Corporation*, a case not cited by either party, the Court did address the recoverability of fees incurred for time spent on

---

[30] *Hanson Indus.*, 90 B.R. at 410; *Baldwin-United*, 79 B.R. at 337; *see also In re Crazy Eddie, Inc.*, 120 B.R. 273, 278 (Bankr. S.D.N.Y. 1990) (recognizing that a "more limited interpretation is indeed 'out of step with the realities' of today's bankruptcy practice").

[31] 384 B.R. 599, 605 (Bankr. N.D. Fla. 1999).

legal and factual research.[32] That case involved the involuntary bankruptcy of a financial services firm with $9 billion in assets and even more in debt. The petitioning creditors sought $3.5 million as an administrative expense under § 503(b)(3). Given the size and intricacies of the debtor's structure in that case, the Court concluded that no creditor with any sense would have filed an involuntary petition without first doing significant legal and factual research.[33] As a consequence, the court concluded that the fees for legal and factual research were allowable as an administrative expense.[34] *Baldwin-United*, however, did not involve research conducted before the petitioning creditor considered the possibility of an involuntary case.

The only case that appears to have addressed that issue is *In re Hanson Industries, Inc.*[35] That case involved an administrative expense application filed by 35 of the debtor's former employees. The debtor in that case—Hanson Industries—processed resin for the roto molding industry. After Hanson suffered excessive and unanticipated losses, its major secured lender—Bank of New England—sued to recover amounts owing on its loan with Hanson and to foreclose on its collateral securing that loan.[36] Months later, the former employees sued Hanson for improper termination.[37] During the course of discovery in the lawsuits against Hanson (which were consolidated), the Bank of New England and the former employees developed considerable information that Hanson had diverted assets to its principal and his family members.[38]

---

[32] *Baldwin-United*, 79 B.R. at 337.

[33] *Id.*

[34] *Id.*

[35] *Hanson Indus.*, 90 B.R. at 410.

[36] *Id.* at 407.

[37] *Id.*

[38] *Id.*

Based on the information discovered during the two state court lawsuits, the Bank of New England and former employees filed an involuntary chapter 7 case against Hanson.[39] Rather than convert to chapter 11, Hanson fought the involuntary petition. An order for relief was eventually entered against Hanson. The former employees and the Bank of New England (as well as their counsel) then sought to recover the fees they incurred as an administrative expense under §§ 503(b)(3)(A) & (b)(4).[40] The bankruptcy court refused to allow the former employees to recover any of the fees they incurred during the state court lawsuit.[41]

In rejecting the former employees' administrative expense claim for pre-petition fees, the bankruptcy court acknowledged that the discovery obtained during the state court case was helpful in deciding whether to file the involuntary case in the first place.[42] The Court also acknowledged that the information had some value in securing the order for relief over the debtor's objection.[43] But the court concluded that the work was too remote in time to the filing of the petition.[44] The state court lawsuit was pending from September 1986 to April 1987, and the involuntary case was filed on May 1, 1987.[45] Although counsel for the former employees argued that "bankruptcy was always an option," the court concluded that it could not "award an

---

[39] *Id.*

[40] *Id.* at 409.

[41] *Id.* at 411-12.

[42] *Id.* at 412.

[43] *Id.*

[44] *Id.*

[45] *Id.*

administrative expense for activities so remote to the actual filing of the petition, even though these activities tangentially benefitted the estate."[46]

The Court agrees with the outcome in *Hanson Industries*, although it would have reached the same result for a different reason. The Court is hesitant to draw a bright-line test based solely on timing. The facts of this case illustrate why. In *Hanson Industries*, the court refused to allow any fees incurred more than a week before the involuntary petition was filed. But here, the petitioning creditors conducted legal analysis *three months* before the involuntary petition was filed, and even the Trustee concedes that research is "directly related to" the involuntary petition. The problem with using timing as the bright-line test is that it will, as the facts of this case illustrate, exclude certain fees that should be allowed.

So the Court proposes an alternative test instead: a petitioning creditor is not entitled to recover any pre-petition fees under § 503(b)(3)(A) for work it would have done had the involuntary bankruptcy case not been filed. That bright-line test harmonizes the two competing goals of § 503(b). For one, it reimburses petitioning creditors for successfully filing and prosecuting an involuntary case, which advances the public policy of marshaling a debtor's assets and equitably distributing them before they are squandered.[47] At the same time, it keeps the administrative expenses to a minimum, thereby preserving the estate for the benefit of its creditors.[48] It also prevents petitioning creditors from receiving a windfall, which would occur if they were reimbursed for fees they would have expended regardless of whether the involuntary

---

[46] *Id.*

[47] *Id.* at 410; *In re Adams Furniture Indus., Inc.*, 1993 WL 13004589, at *3 (Bankr. S.D. Ga. Dec. 10, 1993).

[48] *In re Baldwin-United Corp.*, 79 B.R. 321, 336 (Bankr. S.D. Ohio 1987).

bankruptcy case had not been filed. The Court's alternative test would have resulted in the same outcome in *Hanson Industries*.

And it leads to a similar outcome here. The bulk of the fees incurred by the petitioning creditors was for research or other work done in connection with their state court claims against the Debtors. The Court does not doubt that much of that research, like the research in *Hanson Industries*, was helpful in deciding whether to file this case and eventually securing an order for relief. But the petitioning creditors would have done that work anyway. In fact, much of it was done months before they even considered the possibility of an involuntary case. Again, the goal of § 503(b)(3)(A) is to make creditors whole for bringing a debtor into bankruptcy; it is not to reimburse creditors for fees they would have otherwise occurred in pursuit of their own interests. Accordingly, the Court concludes that the petitioning creditors are not entitled to recover fees for work they would have done had this involuntary case not been filed.

That leaves for consideration the fees the petitioning creditors incurred postpetition. Section 503(b)(3)(B) provides a mechanism for creditors to recover post-petition fees as an administrative expense.[49] Specifically, § 503(b)(3)(B) allows an administrative expense claim for a creditor that recovers transferred or concealed property for the benefit of the estate after first obtaining court approval.[50] By its plain terms, then, § 503(b)(3)(B) imposes two requirements to recovering fees as an administrative expense that are relevant to this case: First, the creditor must recover property for the benefit of the estate. Second, the creditor must first obtain court approval.[51]

---

[49] 11 U.S.C. § 503(b)(3)(B).

[50] *Id.*

[51] There are two other requirements under § 503(b)(3)(B): the petitioning creditors must, in fact, be "creditors" of the debtor; and any recovery of property must be for the benefit of the estate. Neither of these requirements are at

There is some disagreement whether the petitioning creditors recovered property for the benefit of the estate. As a threshold matter, there is no question that the petitioning creditors themselves did not recover any property. Instead, the petitioning creditors contend that their assistance led the Trustee to recover property for the benefit of the estate. It is not clear, however, that a creditor can "recover" under § 503(b)(3)(B) where the trustee—and not the creditor—actually recovers the property. Neither party has addressed this issue. But it appears from the Court's own research that at least one court has held that a creditor cannot recover its post-petition fees under that scenario.[52] Putting that issue aside, the Trustee says there is "absolutely no 'showing' of any specific benefit accomplished by the Petitioning Creditors."[53] In any event, there is no disagreement that the creditors here never obtained court approval for the work they did that they claim led to the Trustee's recovery.

So the real issue before the Court, then, is whether the petitioning creditors can recover their post-petition fees as an administrative expense under § 503(b)(3)(B) without first obtaining court approval. The majority of courts hold that a creditor cannot recover fees under § 503(b)(3)(B) for actions taken without prior court approval.[54] Those courts generally rely on the plain language of the statute. A minority of courts, however, recognize that prior court approval is ordinarily required but nevertheless allow creditors to recover fees as an administrative

---

issue here. There is no question the petitioning creditors are "creditors" of the estate, and the recovery that the petitioning creditors hinge their administrative expense claim on undoubtedly benefited the estate.

[52] *In re Beale*, 358 B.R. 744, 746-47 (Bankr. N.D. Ill. 2006).

[53] Doc. No. 918.

[54] *See, e.g.*, *In re Beale*, 358 B.R. at 747; *In re Elder*, 321 B.R. 820, 828-29 (Bankr. E.D. Va. 2005); *In re Blount*, 276 B.R. 753, 758 (Bankr. M.D. La. 2002); *In re Lagasse*, 228 B.R. 223, 225 (Bankr. E.D. Ark. 1998); *In re Fall*, 93 B.R. 1003, 1012 (Bankr. D. Or. 1988); *In re Romano*, 52 B.R. 590, 593 (Bankr. M.D. Fla. 1985); *Lazar v. Casale (In re Casale)*, 27 B.R. 69, 70 (Bankr. E.D.N.Y. 1983).

expense absent prior court approval under exceptional circumstances.[55] According to those courts, it is unfair to deny creditors compensation for work that resulted in a substantial benefit to the estate, and denying compensation would have a chilling effect on creditor participation in bankruptcy proceedings. The Court adopts the majority view requiring prior court approval for three reasons.

First, requiring court approval is consistent with the plain meaning of § 503(b)(3)(B). As the United States Supreme Court has repeatedly recognized, any interpretation of the Bankruptcy Code must necessarily start with the language of the Bankruptcy Code itself.[56] This Court has likewise repeatedly recognized that same principle.[57] Here, the language of § 503(b)(3)(B) could not be more plain: the court may allow an administrative expense claim for fees or expenses incurred by a "creditor that recovers, *after the court's approval*, for the benefit of the estate any property transferred or concealed by the debtor."[58] Allowing a creditor to recover fees and costs as an administrative expense for action taken without court approval would effectively read the phrase "after the court's approval" out of the statute.[59]

Second, requiring prior court approval is consistent with Congressional intent. The United States Supreme Court recognized in *Dewsnup v. Timm* that "when Congress amends the

---

[55] *See, e.g.*, *In re Morad*, 328 B.R. 264, 270-71 (1st Cir. 2005); *In re Zedda*, 169 B.R. 605, 607-08 (Bankr. E.D. La. 1994); *In re Antar*, 122 B.R. 788, 791 (Bankr. S.D. Fla. 1990); *In re Johnson*, 72 B.R. 115, 118 (Bankr. E.D.N.C. 1987); *In re Rumpza*, 54 B.R. 107, 109 (Bankr. D.S.D. 1985); *In re George*, 23 B.R. 686, 687 (Bankr. S.D. Fla. 1982).

56 *Ransom v. FIA*, 131 S. Ct. 716, 723 (2011) (setting forth standard for interpreting BAPCPA amendments).

[57] *See, e.g.*, *In re Martin*, 2013 WL 5229816, at *4 (Bankr. M.D. Fla. Sep. 17, 2013).

[58] 11 U.S.C. § 503(b)(3)(B) (emphasis added).

[59] *In re Hall*, 373 B.R. 788, 795 (Bankr. S.D. Ga. 2006) (quoting *In re Cent. Idaho Forest Prods.*, 317 B.R. 150, 157 Bankr. D. Idaho 2004)).

bankruptcy laws, it does not write 'on a clean slate.'"[60] For that reason, courts have recognized that "a change in the language of a statute indicates that a departure from the old law was intended."[61] Here, § 503(b)(3)(B) is derived from § 64(a)(1) and (3) of the Bankruptcy Act of 1898. Under § 64(a)(1), a creditor was entitled to an administrative expense claim for fees incurred recovering property for the benefit of the estate.[62] When Congress passed the 1978 Bankruptcy Code, it specifically limited a creditor's right to an administrative expense claim for recovering property for the benefit of the estate to those instances where the creditor sought and obtained prior court approval.[63] Given the legislative history of § 503(b)(3)(B), the Court can only conclude that Congress intended for § 503(b)(3)(B) to apply precisely as its plain language suggests.

Third, requiring prior court approval promotes an important public policy. One of the reasons Congress required court approval was to ensure that the actions taken by creditors were necessary and not duplicative of work performed by the Trustee.[64] Likewise, requiring court approval maintains the Bankruptcy Code's structure of vesting the trustee with the primary duty of recovering property for the benefit of the estate.[65] It has the added benefit of avoiding the scenario alluded to in *In re Blount*:

> A horde of creditors deputized from the inception of the case, ranging out in the countryside recovering what they can find and

---

[60] 502 U.S. 410, 419 (1992).

[61] *In re Casale*, 27 B.R. 69, 70 (Bankr. E.D.N.Y. 1983); *In re Beale*, 358 B.R. 744, 748 & n.11 (Bankr. N.D. Ill. 2006) (citing *Shamrock Oil & Gas Co. v. Sheets*, 313 U.S. 100 (1941)).

[62] *Casale*, 27 B.R. at 70.

[63] *Id.*

[64] *Beale*, 358 B.R. at 748.

[65] *Blount*, 276 B.R. 753, 761 (Bankr. M.D. La. 2002) (explaining that "[u]nder the Bankruptcy Code, the trustee is charged with the primary, original duty to recover property transferred or concealed").

> bringing it to the court to be checked in (approved) before tossing it into the larder.[66]

To be fair, there are public policy concerns that weigh in favor of allowing administrative claims under § 503(b)(3) even where a creditor has not obtained prior court approval, but those public policy concerns are outweighed by the need to maintain the Trustee's primary responsibility for marshaling assets of the estate and avoiding unnecessary and duplicative work.

For those three reasons, the Court concludes that the creditors were required to obtain prior court approval before they are entitled to an administrative expense claim under § 503(b)(3)(B). Because the petitioning creditors failed to obtain prior court approval, they are not entitled to an administrative expense claim for any fees incurred after the order for relief was entered in this case, even if those fees were incurred for work that led to the recovery of property for the benefit of the estate. It is worth noting, however, that even if the Court were inclined to award an administrative expense claim under § 503(b)(3)(B) absent prior court approval, the facts of this case do not warrant that extraordinary relief.

To begin with, some courts that have granted *nunc pro tunc* approval of a creditor's actions have looked to the standards applied for *nunc pro tunc* approval of professionals under Bankruptcy Code § 327.[67] Although the Court declines to adopt the minority view allowing an administrative expense claim absent prior court approval, it recognizes that resort to the standards articulated for *nunc pro tunc* approval at least provides a workable standard. And one of the factors courts consider under § 327—whether the failure to seek court approval resulted

---

[66] *Id.* at 759.

[67] *In re Morad*, 328 B.R. 264, 271 (1st Cir. 2005) (considering whether to allow an administrative expense claim under § 503(b)(3)(B) where the creditor failed to obtain prior court approval); *see also In re Elder*, 321 B.R. 820, 829 (E.D. Va. 2005) (explaining that "[i]f retroactive authority [for court approval under § 503(b)(3)(B)] were available, the three tests for retroactive approval of employment of professionals would be the minimum requirements that must be met").

from extraordinary circumstances—is not present here. The petitioning creditors have offered no reason for their failure to obtain court approval for the fees they incurred. More importantly, the bulk of the work that the petitioning creditors contend led to the recovery of property for the benefit of the estate—providing the Trustee information regarding the Debtors' fraudulent scheme, their assets, and their financial transactions—actually took place prepetition.

In reality, the petitioning creditors are seeking recovery of fees for making a substantial contribution to the estate. Section 503(b)(3) actually permits an administrative expense claim for fees and expenses incurred by a creditor who provides a substantial contribution to the estate.[68] But that provision only applies in chapter 9 or 11 cases—not chapter 7 cases. The Court recognizes that § 503(b)(3) is not intended as an exclusive list of administrative expense claims.[69] The Court, however, joins the other courts that have recognized that "[w]hen a subsection directly addresses the type of administrative expense sought, the restrictions in it cannot be avoided by appealing to the non-exclusive nature of § 503(b)."[70]

**Conclusion**

The Court does not doubt that the petitioning creditors provided a benefit—perhaps even a substantial benefit—to the estate. But the Court cannot award an administrative expense claim in a chapter 7 case based on a substantial benefit. Instead, the Court is limited by the plain meaning of § 503(b). And under the plain meaning of that section, the petitioning creditors are not entitled to an administrative expense claim for any fees they incurred prepetition (through the

---

[68] 11 U.S.C. § 503(b)(3)(D).

[69] Section 503(b) provides that, "after notice and a hearing, there shall be allowed administrative expense claims, *including*" for the specifically enumerated categories." *Id.* (emphasis added). Bankruptcy code § 102 specifically recognizes that the word "including" is not intended to be limiting. 11 U.S.C. § 102(3). So there is no question that the list of categories of administrative expense claims in § 503(b) is not exhaustive.

[70] *Elder*, 321 B.R. at 829; *Beale*, 358 B.R. at 748 (quoting *Elder*).

date the order for relief was entered) for work they would have done had this case not been filed. Nor are they entitled to an administrative expense claim under § 503(b)(3)(B) for any fees they incurred after the order for relief since they failed to obtain court approval for the actions they took to recover property for the estate. The Court will, consistent with this Memorandum Opinion, enter separate orders on the petitioning creditors' administrative expense application and the parties' cross-motions for summary judgment.

**DATED** in Chambers at Tampa, Florida, on September 30, 2013.

Michael G. Williamson
United States Bankruptcy Judge

**Robert E. Tardif, Jr.**
*Trustee*

**Roberta A. Colton, Esq.**
**Stephanie Crane Leib, Esq.**
*Attorneys for Petitioning Creditors*

Service Instructions: Robert E. Tardif is directed to serve a copy of this order on interested parties and file a proof of service within 3 days of entry of the order.